IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JAMES CALEB THOMAS, )<br>    Plaintiff, )<br>) Case No. 7:20-cv-00584<br>v. )<br>) By:   Michael F. Urbanski<br>STEPHEN CLEAR, et al., ) Chief United States District Judge<br>    Defendants. ) | |

## MEMORANDUM OPINION

This matter is before the court on defendants Stephen Clear and Larry Chad Kilgore's motion for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. ECF No. 26. Plaintiff James Caleb Thomas, a former Virginia inmate proceeding pro se, opposes. ECF No. 34. For the reasons discussed below, the court will **GRANT** defendants' motion for summary judgment in its entirety.

### I.

James Thomas was incarcerated in the Southwest Virginia Regional Jail Authority ("SWVRJA" or the "Jail").[1] Compl., ECF No. 1, at ¶ 5. At all relevant times, Stephen Clear was the superintendent of SWVRJA, and Major Chad Kilgore was the SWVRJA administrator.[2] Id. at ¶¶ 6-7.

On July 15, 2020, Thomas received an inmate mail rejection form from the Jail mailroom, notifying him that SWVRJA rejected mail addressed to Thomas from the Theosophical Society. Id. at ¶ 39; Br. in Supp. of Mot. for Summ. J., ECF No. 26, at 3. The

---

[1] As of September 13, 2021, Thomas has been released from custody. See Change of Address, ECF No. 39.
[2] All other defendants have been dismissed. See Order, ECF No. 33.

1

Theosophical Society is "a religious-based organization in the business of sending prisoners books, publications, and periodicals and allows them to subscribe to monthly editorials and pamphlets." ECF No. 1 at ¶ 42; see also ECF No. 26 at 5-6. Initially, Thomas was not given a reason for his mail being rejected.

> On July 17, 2020, Thomas submitted a grievance inquiry to the Jail, stating:
>
>> This is in regards to the inquiry from the mailroom 7/15/20 about my rejected mail. This was mail from the Theosophical Society (religious organization). I have gotten mail from them before so I don't know why it was rejected. Why is [there] no officer to appeal the rejected mail to? Has the mail been sent back? If so then why wasn't I allowed to appeal this to someone to review the rejected mail before it was return[ed]? I believe my due process has been denied.

ECF No. 26-2 at 1.

On July 21, 2020, the Jail accepted Thomas's grievance, and a grievance officer responded, "[A]fter speaking with the mailroom clerk it was determined that your mail was rejected for blue ink." Id. The Jail has penological concerns about admitting mail with large amounts of colored ink because the ink may be damaging to the health and safety of the Jail. Specifically, colored ink is often used to smuggle in contraband such as drugs. Am. Decl. of Lieutenant Jeannie Patrick, ECF No. 35-1, at 3. Moreover, the ink is used to tattoo, augmenting the spread of communicable diseases amongst inmates and jail staff. Id. Furthermore, the Jail does not have the resources to adequately check every piece of heavily colored ink mail to determine whether the mail has been altered. Id. As such, the Jail prefers that reading materials be donated to the Jail's bookroom, of which inmates have access. Stephen Clear Decl., ECF No. 26-4, at 2. These reading materials undergo a "one-time analysis," which is "far more manageable for the Jail than analyzing thousands of mailed items

to individual inmates." Id. There are no restrictions on inmates corresponding with publishers to request specific reading materials be donated to the Jail's bookroom. Id.

On July 22, 2020, Thomas appealed the Jail's rejection, expressing:

> I received mail from the Theosophical Society before in color. In fact, they sent me a full color pamphlet that was very long which was allowed. So what's the difference[ ]? You have no reason to reject my mail from them based on color ink when you allow full color pamphlets. Also you did not answer why I wasn't provided an impartial jail official other [than] the person who rejected the mail for review. You gave me no such review. Has the pamphlet been returned to the Theosophical Society?

ECF No. 26-2 at 1. The Jail accepted Thomas's appeal on July 23, 2020, and a grievance appeal officer said, "[T]he sender has the right of appeal to the jail administrator, you only receive a mail confiscation or rejection form." Id.

At the same time Thomas was corresponding with the Jail through its grievance process, he was writing letters to Clear and Kilgore as well. On July 19, 2020, Thomas wrote Clear and Kilgore, largely restating what he would assert in his July 22, 2020 appeal noted above. On July 23, 2020, Kilgore wrote Thomas back, noting in relevant part, "All religious material that meets security needs will and has been approved to come back. Too much color and content may reflect different in each book." Id. at 33. On July 30, 2020, Kilgore further explained to Thomas that "[t]he mail is scanned by me and as long as there are no penological threat[s] I allow the religious material to go back. Thanks for bringing to my attention that after scanning all the mail I have missed one that you feel has too much color. Please give that one back to the pod officer as soon as possible." Id. at 38. Later that day, the Jail again sent Thomas a mail rejection form notifying him that the Jail rejected another pamphlet from the

3

Theosophical Society. While Thomas did not file a formal grievance for the July 30, 2020 mail, he did write another letter to Clear and Kilgore.

On August 3, 2020, Thomas wrote Clear and Kilgore, arguing:

> The first and most important issue regarding my mail is I was not given an appeal process to have my mail reviewed by another officer before it was returned. Along with your letter dated July 30, 2020 I was given another rejection form rejecting mail from the Theosophical Society. Once again there was no reason for rejection and no way to challenge therefore denying me my 14th amendment right to adequate due process. In my previous letters you have completely ignored this issue, why?
> Might I respectfully recommend you to begin giving us prisoners an appeal process and a way to challenge the rejection before the mail and/or publication is sent back to the sender. Also give on the Inmate Mail Notice Form the reason for the rejection and the address of the sender in case I and/or other prisoners do not have it, or I am going to take this matter to civil court.
> The second issue you failed to respond to is my inquiry about the Jail's operation procedures/guidelines for incoming mail and publications. This is important, because I am confused and do not know what mail or books I can or cannot have. As far as I know we are not even allowed to have Bibles sent to us and most if not all books will be rejected. This is unfair and I feel it is unconstitutional.

ECF No. 34-5 at 12-13.

On August 11, 2020, Kilgore responded to Thomas's letter. In relevant part, he said:

> When books or letters are returned to sender there [are] no rights violated. You are confused between confiscation and return to sender actions of periodicals and letters. When or if you have something confiscated then you shall receive more info but yours was only returned to sender. We will not start an appeal process on items returned. The only books that are allowed have to be religious, legal or educational.
> - Religious must be from a true practiced religion. As for the Bibles there are provided by the jail. If you are practicing a religion that we do not have a Bible for then you can reach out to a leader of that religion to have them

4

>      to donate the Bible of your choice to the facility, then we
>      will get it to you.

Id. at 2. Defendants are unaware of any binding precedent or law which prohibited their conduct or informed them that their actions violated Thomas's First and Fourteenth Amendment rights. Chad Kilgore Decl., ECF No. 26-3, at 3; ECF No. 26-4 at 3; ECF No. 35-1 at 4.

On September 29, 2020, Thomas brought suit under 42 U.S.C. § 1983, alleging violations of his First Amendment rights and Fourteenth Amendment due process rights.[3] Thomas contends that he is entitled to relief because the Jail's mail policy (1) is unknown to inmates; (2) is arbitrary because he has received full color pamphlets before and some mail containing colored ink is allowed, leading to biased decisions as to what mail is accepted or rejected; (3) does not provide a reason as to why mail is rejected; and (4) does not provide for inmates to appeal their mail rejection to an impartial officer. ECF No. 1 at ¶¶ 37-43. Thomas seeks declaratory and injunctive relief, nominal, compensatory, and punitive damages. Defendants oppose and filed for summary judgment, asserting that (1) Thomas's First Amendment rights were not violated because the Jail's colored ink concerns are rationally related to the legitimate penological interest of protecting the health, safety, and welfare of the Jail's inmates and staff; (2) Thomas's Fourteenth Amendment rights were not violated because Thomas was afforded more than the constitutionally protected minimum due process requirements; and (3) even if Thomas's First and Fourteenth Amendment rights were violated,

---

[3] In addition to these claims, Thomas asserted that his Eighth Amendment rights were violated. See ECF No. 1. However, Thomas filed a motion notifying the court that he no longer wished to pursue his Eighth Amendment claims against defendants, see Mot., ECF No. 32, and the court granted Thomas's motion, see Order, ECF No. 33. As such, this opinion only addresses the remaining First and Fourteenth Amendment claims.

5

Clear and Kilgore are entitled to qualified immunity because defendants are unaware of any binding precedent or law that prohibited their conduct or informed them that they were violating Thomas's rights. ECF No. at 2.

## II.

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the

Case 7:20-cv-00584-MFU-JCH   Document 40   Filed 09/20/21   Page 6 of 20   Pageid#: 483

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## III.

To begin, the court must dismiss Thomas's claims for declaratory and injunctive relief. "Mootness questions often arise in cases involving inmate challenges to prison policies or conditions, and courts, including our own, have held that the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition

7

moots his claims for injunctive and declaratory relief, even if a claim for money damages survives." Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007); Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). A transferred or released inmate's declaratory and injunctive claims are moot because when an inmate leaves the facility where he was subject to the policy, practice, or condition, he no longer has a cognizable interest in the resolution of said claim. Incumaa, 507 F.3d at 287. This holds true even where an inmate may be transferred back to the offending facility as long as there is "no reasonable expectation that the wrong will be repeated[.]" Id. at 288; see also United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).

Here, Thomas was released from custody and is no longer subject to any of the Jail's offending policies. There is no indication in the record that Thomas will return to SWVRJA nor will the court infer such a scenario. See Incumaa, 507 F.3d at 289 ("For us to find the exception [to mootness] applicable here, then we would have to forecast bad behavior on Incumaa's part. We surely cannot base our mootness jurisprudence in this context on the likelihood that an inmate will [reoffend]."). As such, Thomas's claims for declaratory and injunctive relief are dismissed as moot. The court will now address his remaining First and Fourteenth Amendment claims for damages.

### A. First Amendment Claims

As to Thomas's First Amendment claims, defendants did not violate Thomas's rights because prohibiting mail with excessive colored ink is a content-neutral policy that is rationally related to the Jail's legitimate penological interest of reducing drug contraband and illicit tattooing, thereby protecting the health and safety of the Jail's inmates and staff.

Inmates retain the First Amendment rights afforded to them by the Constitution. Pughsley v. Robinson, No. 1:20-cv-102 (AJT/TCB), 2021 WL 3634618, at *4 (E.D. Va. Aug. 16, 2021) ("'[T]he First Amendment rights retained by convicted prisoners include the right to communicate with others beyond the prison walls." (quoting Heyer v. United States Bureau of Prisons, 849 F.3d 202, 213 (4th Cir. 2017))). However, "an inmate's First Amendment rights must often bow to other valid penological concerns." Ballance v. Virginia, 130 F. Supp. 2d 754, 758 (W.D. Va. 2000), aff'd sub nom. Balance v. Rowlette, 11 F. App'x 174 (4th Cir. 2001); see also Overton v. Bazzetta, 539 U.S. 126, 131 (2003) ("Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration."). As such, even if a prison's regulation infringes on an inmate's First Amendment rights, the regulation is constitutional as long as it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).

Maintaining safety and security and preserving prison resources are legitimate penological interests. United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). Moreover, a prison's regulation that affects mail sent to prisoners is principally concerned with maintaining order and security in the prison. Ray v. Metts, No. 4:04-23048-TLW-TER, 2009 WL 2983008, at *5 (D.S.C. Sept. 14, 2009) (citing Thornburgh v. Abbott, 490 U.S. 401, 404 (1989)). Courts give "substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132.

In order to determine a prison regulation's reasonableness, courts examine (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[ ]"; (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates[ ]"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[ ]"; and (4) whether there is an "absence of ready alternatives" to the regulation in question. Turner, 482 U.S. at 89-90. If a policy is unreasonable or arbitrary under the first factor, then it is unconstitutional irrespective of the other factors. Shaw v. Murphy, 532 U.S. 223, 229-30 (2001). Importantly, the fourth factor is not a least restrictive alternative. Turner, 482 U.S. at 90. Rather, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91. The prisoner bears the burden of proving the unreasonableness of the prison regulation. Pughsley, 2021 WL 3634618, at *4. The court will address each factor in turn.

**1. Valid, Rational Connection Between the Regulation and Legitimate Government Interest**

Thomas avers that the Jail's policy of prohibiting colored ink pamphlets is not content-neutral nor is it rationally related to promoting the health, safety, and welfare of the Jail. Br. in Opp'n of Mot. for Summ. J., ECF No. 34, at 7. To support this assertion, Thomas states that the Jail's motion and exhibits "contain no evidence whatsoever that drugs have ever been introduced into the Jail via color ink." Id. Moreover, Thomas asserts that because the pamphlets come straight from the publisher, there is "relatively little risk" that the pamphlets

10

contain contraband. Id.; see Bell v. Wolfish, 441 U.S. 520, 549 (1979). Furthermore, Thomas argues that the Jail's mail policy is arbitrary because the Jail allows some full color pamphlets and photos. ECF No. 34 at 8. To be sure, Thomas contends that the court has previously addressed this issue and found that allowing inmates to possess colored ink pamphlets posed no additional safety or security concerns. Id.; see also Hum. Rts. Def. Ctr. v. Sw. Virginia Reg'l Jail Auth., 396 F. Supp. 3d 607, 619 (W.D. Va. 2019) ("HRDC"). The court cannot agree.

First, it is well settled that courts give great deference to policies that prison officials say are reasonably related to the prison's penological security interests. See Florence v. Bd. of Chosen Freeholders of Cnty. Of Burlington, 566 U.S. 318, 328 (2012) ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials.") (internal quotation omitted); Block v. Rutherford, 468 U.S. 576, 584-85 (1984) ("[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters."); Williams v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996) (stating that prison administrators are provided discretion to determine what policies are necessary to ensure the prison's "internal security" and that great deference should be given to prison officials), overruled on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010). Plainly, although all facts and reasonable inferences are viewed in the light most favorable to Thomas, he fails to meet his burden of showing that the Jail's mail policy is unreasonable. Merely stating that the Jail provides no evidence of drug smuggling through colored ink is insufficient. As such, he cannot overcome the deference given to the Jail officials who state that prohibiting excessive colored-ink

pamphlets promote the safety and security of the Jail by reducing drug contraband and illicit tattooing.

Furthermore, HRDC is inapposite. There, a non-profit organization, HRDC, which provided prisoners with access to information about their civil and legal rights sued the SWVRJA, alleging that the Jail's mail policy violated the organization's First and Fourteenth Amendment rights. At issue were two books with colored ink covers bound together with glue. Specifically, HRDC asserted that the Jail was censoring and refusing to deliver educational materials sent to inmates. Moreover, HRDC alleged that the Jail was rejecting mail without providing inmates an opportunity to appeal the Jail's decision to block the mail. The Jail had a blanket ban on all non-legal, noneducational, and nonreligious magazines, newspapers, periodicals, and other reading materials that were not provided from the Jail's bookroom. However, the Jail's policy was arbitrarily applied and inconsistently communicated to inmates. The Jail asserted that this blanket ban on reading materials was necessary to ensure the safety and security of the inmates and staff, particularly to prevent staples from entering the facility, fire hazards, and drug smuggling.

The district court ruled:

> Spines and covers are removed from donated hardcover books. Books sent directly from publishers pose little risk of drug smuggling, and HRDC's books do not contain colored paper or ink except on their covers. The Jail Authority's interests in preventing fires and drug smuggling are certainly legitimate, but the undisputed evidence shows that a complete ban on books sent from publishers is not rationally related to those interests.
> . . .
> Importantly for this case, there is no procedure by which a publisher can request preapproval of a book it wishes to send an inmate. Thus, a publisher is not permitted to send any unsolicited

> book to any inmate, regardless of its contents and even if it poses no security risk.
>
> . . .
>
> I conclude that based on the undisputed facts, and giving jail officials the significant deference to which they are entitled, the Jail Authority has demonstrated that it has a legitimate interest in preventing staples from entering its jails. However, a complete ban of magazines is not rationally related to that interest, nor is it rationally related to the Jail Authority's interest in reducing fire hazards. I reach this conclusion largely because of the existence of the easy, obvious alternative of having Jail Authority employees remove the staples when processing the mail. That alternative, along with the fact that other policies address accumulation of inmate property and prohibit hanging clippings in cells, suggests that the magazine ban is an exaggerated response by the Jail Authority.

HRDC, 396 F. Supp. 3d. at 622-23.

This case is distinguishable for several reasons. First, HRDC concerned a publisher's rights rather than an inmate's rights. To be sure, the HRDC court noted this fact. See id. at 622 (distinguishing Hause v. Vaught, 993 F.2d 1079 (4th Cir. 1993), in which the Fourth Circuit ruled against a prisoner who challenged a detention center policy that prohibited outside publications, from this case in part because Hause dealt with a prisoner's rights rather than the publisher's rights). Second, HRDC contained a blanket book and magazine ban whereas the SWVRJA policy only prohibits mail that contains too much colored ink. Third, the books at issue in HRDC solely contained ink on the covers, which were easily removable by the prison before delivering the books to inmates. In fact, the Jail was already in the practice of removing colored ink covers and binding glue before delivering books to inmates. HRDC, 396 F. Supp. 3d at 621. In this case, the entire Theosophical Society pamphlet was full of colored ink. As such, removing only its cover is inapplicable.

Next, the prison's ink policy is content-neutral. Thomas asserts that because some colored materials, such as certain photographs of friends and family and some news publications, are allowed, the Jail's policy is arbitrary. ECF No. 34 at 8. But this is not so. Indeed, certain colored ink materials below the requisite threshold of excessive colored ink are permitted. Kilgore told Thomas that "[t]oo much color and content may reflect different in each book." ECF No. 26-2 at 33. The Jail regulates what colored publications are accepted based on its safety and security concerns. Where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are neutral in the technical sense in which we meant and used that term in Turner." Thornburgh, 490 U.S. at 415-16.

In sum, the Jail has a legitimate penological interest in the safety and security of its inmates and staff. The Jail's content-neutral mail policy of prohibiting reading material that has excessive colored ink for fear of drug smuggling and illicit tattooing is rationally connected to said penological interest.

**2. Alternative Means of Exercising Rights Exist**

The Jail contends that there are alternative means for Thomas to exercise his right to receive outside communications. The Jail asserts that Thomas could request senders to limit the amount of ink contained in publications or request that reading materials be donated to the Jail bookroom rather than sent to individual inmates.

Thomas opposes, stating that there is no guarantee that inmates would receive the donated reading materials. See HRDC, 396 F. Supp. 3d at 621 ("[I]t is further undisputed that donated books are unlikely to reach their intended recipients in a timely fashion and may not

14

reach them at all."). However, Thomas again conflates the applicability HRDC to this case. HRDC concerned publisher's rights and found that requiring the publisher to donate books to the Jail's bookroom left no alternative means for HRDC. See id. ("HRDC has met its burden of demonstrating that the Jail Authority's book ban and preapproval process leaves open no alternative means for HRDC to exercise its right to communicate with prisoners."). There is nothing in the record to suggest that requesting limited ink publications or Jail bookroom donations are inadequate means for Thomas to exercise his rights.

**3. Impact of Accommodation on Guards, Inmates, and Prison Resources**

Thomas alleges that allowing full colored ink reading materials would not present any undue burden on prison resources. ECF No. 34 at 9-10. He avers that because the Jail already has enough resources to "search[ ] to make sure [inmates] only have the allotted number [of books] you can have," see Chad Kilgore Letter Dec. 23, 2019, ECF No. 34-9, at 2, further allowance of full colored ink publications poses no additional burden on staff or prison resources.[4] Additionally, Thomas contends that because the Jail already has a policy for examining all incoming mail for "currency or contraband," see SWVRJA Standard Operating Procedures, ECF No. 34-3, at 6, no changes are required in the Jail's policy to allow fully colored reading materials, ECF No. 34 at 10.

The Jail proffers that allowing fully colored ink reading materials would stress the facility's resources, and the court agrees. Thomas's argument fails to appreciate the

---

[4] Thomas also cites Prison Legal News v. Cook, 238 F.3d 1145, 1150 (9th Cir. 2001), where the Ninth Circuit found "[t]he fact that Department property regulations already limit the amount of material an inmate can possess . . . refute[s] the common sense connection between the refusal to deliver subscription standard mail and reduction of fire hazards." However, this is inapplicable because there is no allegation that Thomas holds a subscription in this case.

15

complexities of examining colored ink for contraband as opposed to examining other mail for loose contraband. As stated by the Jail, "[d]iscovering drug-laced color ink requires analysis beyond that necessary for more apparent contraband." ECF No. 35 at 4-5. Because of these complexities, the Jail would need to commit additional staff and materials to examining the colored ink reading materials. As such, allowing full colored ink reading materials would impose a substantial burden on prison staff and already scarce prison resources.

**4. Absence of Ready Alternatives**

Thomas provides no evidence of a viable alternative to the Jail's colored ink mail policy. In sum, there is nothing in the record to support a finding that the Jail's policy is an exaggerated response to the Jail's safety and security concerns. Thus, Thomas's First Amendment claim fails.

### B. Fourteenth Amendment Claims

As to Thomas's Fourteenth Amendment claims, defendants did not violate his rights because Thomas was afforded more than the constitutionally protected minimum requirements of due process when Thomas was notified in writing that his mail was rejected; provided with the reason as to why his mail was rejected; given an opportunity to grieve the Jail's decision; and afforded an opportunity to appeal his grievance and have it reviewed by an officer other than the one who rejected his mail.

Inmates have a due process right regarding their mail. Procunier v. Martinez, 416 U.S. 396, 418 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989). As such, prison officials must provide at least "minimal procedural safeguards in limiting or restricting inmates' mail, including notice to both inmates and the senders if it does not create

an undue burden." Dixon v. Kirby, 210 F. Supp. 2d 792, 799 (S.D.W. Va.), aff'd, 48 F. App'x 93 (4th Cir. 2002).

For a jail's rejection of mail to be constitutional, the jail is required to (1) notify the inmate of the rejection of a letter written or addressed to him; (2) provide the author of the letter a reasonable opportunity to protest that decision; and (3) refer complaints to a prison official other than the one who originally rejected the mail. Procunier, 416 U.S. at 418-19.

Thomas asserts that his due process rights were violated because he was not provided a reason as to why his mail was rejected; his appeal was not addressed by a third-party officer; and his mail was returned prior to completing the grievance process. ECF No. 34 at 12-13. However, none of Thomas's arguments hold merit.

First, due process does not require Thomas to ascertain a reason why the Jail rejects his mail. He is only entitled to notice of the rejected mail. Therefore, it is of no consequence that he was not initially given a reason why his mail was rejected. In any event, Thomas not only received notice but was later told that his mail was rejected because it contained too much colored ink. See ECF No. 26-2 at 1. Second, Thomas was not the author of his rejected mail, so he was not entitled to a reasonable opportunity to protest the Jail's decision. Nonetheless, Thomas was able to protest the Jail's decision as evidenced by his filing of a grievance and appeal.[5] Lastly, a grievance officer other than the mailroom officer who initially rejected Thomas's mail responded to his complaint. Furthermore, a grievance appeal officer responded

---

[5] Thomas did not file a grievance or appeal for the mail rejected on July 30, 2020. As such, he has not exhausted his administrative remedies, and the court will not consider any argument to that extent.

to Thomas's appeal. In total, two different grievance officers reviewed Thomas's complaints.[6] The evidence clearly shows that Thomas was provided more than the minimum due process requirements articulated in Procunier as regards his rejected mail. As such, his Fourteenth Amendment claim must fail.

### C. Qualified Immunity

Even if the court determined that Thomas's First and Fourteenth Amendment rights were violated, defendants are entitled to qualified immunity. Claims brought under 42 U.S.C. § 1983 require three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under the color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997). An official who is sued in their individual capacity is a person within the meaning of § 1983, but they may be entitled to qualified immunity. Hafer v. Melo, 502 U.S. 21, 25 (1991).

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Meyers v. Baltimore City, 713 F.3d 723, 731 (4th Cir. 2013). Defendants asserting qualified immunity have the burden of proof. Id. Moreover, qualified immunity is immunity from suit rather than solely immunity from liability. Id.

---

[6] Defendants concede that there is a scrivener error in their brief that states that Kilgore responded to Thomas's grievance. See ECF No. 26 at 2 ("[Thomas] filed a grievance (to which Kilgore responded) . . . ." Defendants state that it should read, "to which a grievance officer responded[.]" See ECF No. 35 at 2 n.2; see also ECF No. 26-3 at 2.

In order to determine the applicability of qualified immunity, courts must determine "whether a constitutional violation occurred," but also "whether the right violated was clearly established" at the time of the alleged violation. Tobey v. Jones, 706 F.3d 379, 385 (4th Cir. 2013). This is because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015) (citations omitted). Furthermore, a court is "free to 'skip ahead to the question whether the law clearly established that the [defendant's] conduct was unlawful in the circumstances of the case.'" HRDC, 396 F. Supp. 3d at 625 (quoting Adams v. Ferguson, 884 F.3d 219, 226 (4th Cir. 2018)). A violation of clearly established law only occurs when "existing precedent . . . placed the constitutional question beyond debate." Reichle v. Howards, 566 U.S. 658, 664 (2012). "A right is clearly established if the contours of the right are sufficiently clear so that a reasonable [official] would have understood, under the circumstances at hand, that his behavior violated the right." Campbell v. Galloway, 483 F.3d 258, 271 1(4th Cir. 2007). Simply, "existing precedent must have placed the statutory or constitutional question . . . beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (internal quotation omitted). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier v. Katz, 533 U.S. 194, 202 (2001). Qualified immunity applies to "all but the plainly incompetent or those who knowingly violate the law." Raub, 785 F.3d at 881.

As to Thomas's First Amendment claims, there is no clearly established law prohibiting the Jail from screening mail by rejecting inmates' mail that has excessive colored ink to prevent illicit tattooing and the entry of smuggled drugs. To the extent Thomas asserts that HRDC is

19

controlling, see ECF No. 34 at 15, he is misguided. To be sure, HRDC's ruling is limited to a publisher's rights. See HRDC, 396 F. Supp. 3d at 625-26 (holding that a prison official is entitled to qualified immunity because there was no clearly established law that would have alerted him that the Jail's policy violated the publisher's rights). Moreover, as to Thomas's Fourteenth Amendment claims, there is no evidence to support a finding that Procunier or its progeny require more procedural safeguards than Thomas received regarding his rejected mail. Questions regarding the constitutionality of the Jail's mail policy and the additional amount of procedural safeguards owed to Thomas have not been placed "beyond debate." See Ashcroft, 563 U.S. at 741.

In sum, Thomas has not pointed the court to any controlling precedent which would have alerted defendants that they were violating Thomas's First or Fourteenth Amendment rights, and defendants are unaware of any such clearly established law. As such, defendants are entitled to qualified immunity.

## IV.

For these reasons, the courts finds that there is no genuine dispute of material fact as to whether defendants violated Thomas's First and Fourteenth Amendment rights. As such, the court **GRANTS** defendants' motion for summary judgment in its entirety. The Clerk is directed to close this case, and it is **STRICKEN** from the active docket of the court.

An appropriate order will be entered.

Entered:   September 20, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.09.20 11:28:10 -04'00'

Michael F. Urbanski
Chief United States District Judge